May it please the Court, Michael with you on behalf of the appellants. I appreciate the Court's giving us 20 minutes. I'd like to reserve 5 if I could for the argument. On February 26th and 27th of 2001, the Seattle Police Department abandoned its written operational policy of aggressive, high visibility, proactive enforcement, law enforcement to protect the public safety in Pioneer Square in favor of an ad hoc policy to not employ proper command and control techniques and to evacuate. So what? As a result, roving bands of the so what goes to they had one policy and they changed it to another one. One might or might not have been more effective or less effective in the circumstances. But what difference does changing the policy make? Two things. First of all, Your Honor, the under the Monell theory, which the district court never even referred to. Well, it has to be triggered first by deprivation of a constitutional right. If there isn't one, then you don't even get there. Quite right. And the constitutional right is the right, as the Kennedy v. Ridgefield case found, to be bodily integrity under either the state creation danger theory or the Monell theory. The plaintiff's right to bodily integrity central to the due process. I don't understand either why you think the Monell theory stands on its own somehow. The Monell theory concerns how you reach the city if there was a constitutional deprivation. But first you have to have a constitutional deprivation. And it's the same constitutional deprivation, unless I'm misunderstanding something. Do you think there's some there's a way to find a different constitutional deprivation under a Monell theory? No. I think the constitutional deprivation was the deprivation of the plaintiff's rights to bodily integrity, even if the — All right. Maybe that deprivation is the wrong word. A constitutional violation. Yes. A constitutional violation occurs if the custom and practice of the police, in this case the nonemployee proper command and control techniques, evidence from the WTO demonstration, evidence in the Mardi Gras riots, if that results in third parties — So you essentially think that you can get a Monell theory cut out from the whole Ducheney line of cases, so don't have to deal with the Ducheney line of cases if you're alleging a Monell theory. Is that what you're saying? That's correct, because the cases we cited under the Monell theory, which were the McKenna v. County and Nassau and Mays v. Elrod, both of those were Monell cases in which third parties assaulted inmates. In those cases — Those were inmates. So under the Ducheney theory, the Ducheney cases wouldn't apply, because the whole — we know in general that once you have somebody in custody, then there's a whole different set of rules that apply because you have them in custody. Well, they didn't hold that the — neither of those two cases held that Monell, under the Monell theory of cases, relied upon the state creation danger theory, which is Ducheney. But you didn't have to, because we know that when somebody is in custody, the Ducheney theory doesn't apply, because they're in — you're a problem at that point if you're the government. Why don't I turn, then, to the state created danger theory, because I think that is clearly under Kennedy v. Richfield, the majority opinion. In fact, the minority — the dissenting opinion from the denial of in-bank reconsideration found that there is a constitutional violation where third parties commit a violation of bodily integrity. Well, but it's — but there's some more conditions to it. There are. But you have to have, you know, some kind of affirmative conduct, some kind of interaction that places the plaintiff in danger. That's correct, Your Honor. And that — but first of all, the affirmative decision — you asked what difference does it make that they abandon operational policy. Is it — that was an affirmative decision. That was not mere inaction as the district court held it. Well, it's a decision, but it's not affirmative conduct. Well, yes. It places the specific plaintiff in danger. Well, we believe it was. I mean, it may have been a lousy decision. I'm not saying it was good, bad, or indifferent. But it was just changing one policy to another policy that, in retrospect, turns out to have perhaps not been as copacetic as it might otherwise be. It wasn't even in retrospect, Your Honor. It was both prospectively. It was determined that — Okay. The problem is, let's assume the policy — let's assume the decision was lousy. Okay. Just never mind it. Just assume it was lousy and ineffective. How does that meet the affirmative conduct putting a specific plaintiff in danger criterion? First of all, the plaintiffs in danger came from the fact that the police were aware that there were revelers, these specific plaintiffs included, in Pioneer Square. We're also aware of the fact that the gang members, the roving gang members, were two or three carloads of them were outside Pioneer Square practicing kickboxing moves about to go into Pioneer Square, that the police were able to observe gang members in the crowd. And this is irrefutable. This is hard evidence from the police department. That was the danger. So what was the affirmative decision was the affirmative decision was this great operational plan we had, which would have — which would, in Sergeant Scott's words, again, the police department's words, would have intercepted those gang members before they got to the Pioneer Square, would have assigned a situation analysis team, a SAT team, and an arrest team to arrest them before they could do the horrible damage. That was the affirmative decision. That's not mere inaction. But, first of all, was this earlier plan publicly announced? No. Did the police or the city or anybody ever say to people, come to Pioneer Square, you'll be safe? There was no specific statement of that effect. Obviously, the whole purpose of the police presence there was to protect the public safety. So the fact that the police were going to be present is certainly a statement, if you will, that they're going to, quote, serve and protect, which is their model and their slogan. Was there an announcement that the police were going to be present? Beg your pardon? Was there an announcement that the police were going to be present? Sure. Absolutely. The police were going to be present by the virtue of the fact they'd been present for all four days of the Mardi Gras and that they said they were going to enforce the law. So, I mean, is there a strongest case that these people wouldn't have come there at all if they didn't think the police were going to be in a position to keep things safe? Well, there's evidence of that in the record. That wasn't the basis of the district court's decision. The district court mischaracterized the record in three particulars. One, they said this was mere inaction. This was merely the district court in the city's brief argues Officer Brian or Commander Brian decided not to reinsert the officers after withdrawing them after being hardened. And that's refuted by the after-action report by Assistant Chief Diaz, who said in the planning portion of that after-action report and command and control that the operational plan had been abandoned, leading to ad hoc eleventh-hour decisions made, meaning at the time of the event. So on this thesis, the whole case would be different if the plan that they eventually used was their original plan. Why should that be from the point of view of putting people in danger or not putting them in danger? Well, because it made all the difference in the world. And I have a chart to show you. This is what I'm asking you. Suppose they had never had their first plan. Right. Suppose they only had the second one. You would then lose on your theory. Well, because there was no affirmative decision. There's no affirmative placing of plaintiffs. Well, the decision has to do with a different, with a Monell issue. The constitutional issue, as it were, is conduct, affirmative conduct aimed at a specific plaintiff. Otherwise, every time you had a riot, there would be a constitutional violation if anybody got hurt. Well, I don't think that's true because I don't think that you can prove in any particular riot that some affirmative decision was made to abandon a policy of interference and interception of gang members going in versus a policy that said everybody withdraw. I'm having a hard time with this. Suppose the city's policy in general, written down and announced, was if gang members come to Pioneer Square, we're just going to leave them alone. Right. Do you win or lose? We win. That's an affirmative policy decision. That's an affirmative decision that enhances the danger to specific individuals who are there at this particular event. This wasn't just some, you know, general call. Well, at that point, they could just stay away from Pioneer Square. Well, but the city sponsored the Pioneer Square events. This wasn't stay away, we don't want you to come because gang members might beat you up. That wasn't the facts of this case. But in your scenario, your hypothetical, Your Honor, there would be liability because there was an affirmative policy decision reached. And it doesn't even have to be a policy decision. It could be an affirmative decision reached by commanders to ---- So at that point, I'm just trying to get your theory clear. Sure. So the change doesn't matter anymore. The fact that they had a different policy first is irrelevant. It's not irrelevant because that's an affirmative decision. No, but I just gave you a hypothetical where there was no change. There never was an earlier policy. They simply announced in advance of this whole event, you're on your own, you guys, we're not going to do anything. Right. In that case, it was an affirmative act of that policy then. Yes. I think that does invoke the state-created danger theory and the Hanson theory. But in this factual case, the court, the district court's decision that was mere inaction is simply factually wrong. And under Kennedy, the inferences should be drawn in favor of the plaintiffs, not in favor of the city in this situation. But in Kennedy, they did give an issue. A, they, to some degree, they created the danger by telling the person with the gripe, you know, to have the gripe essentially after having been asked not to. And B, they made a promise to protect the person and didn't. Well, that was a factual context. But certainly in the various cases, the Ninth Circuit, Wood v. Ostrander, there wasn't any statement. There wasn't any alliance or reassurance. In that case, police just left, left the person in the, you know, in an area that was dangerous. But they put her there. They put her there, and they, and it was specific to that individual. True. But this was specific to these individuals, these 11 plaintiffs and the other people that were assaulted. Well, it was 7,000 people who were gathered in Pioneer Square. But 7,000 were assaulted. Well, but that's, that comes back to my point. If you're correct, then every time there's a riot and somebody gets hurt, there's a constitutional violation. Well, I don't believe that to be true. You have to meet the ---- Why not? How do you separate it? How do you distinguish a riot, a general riot, where the police can't control it or don't control it, and somebody gets hurt from this case? Yes, Your Honor. In your hypothetical, there was no affirmative decision reached that placed specific plaintiffs. In this case, the individuals are in Pioneer Square. Everybody wasn't assaulted, by the way. This was racially motivated assaults. These were members of a gang who used epithets at white women that they were assaulting. So there was, in this case, an affirmative decision placing those plaintiffs in a much more dangerous situation than had they not. For instance, on Friday and Saturday night, they had a riot, for instance, on Friday and Saturday night. No one was injured. Why not? We have a chart. The chart's in the record. The reason was they had effective, forceful, aggressive law enforcement, and that was the operational plan, and they had commanders that knew what they were doing. On Tuesday night, they had no operational plan. That had been abandoned. All they were going to do was withdraw, and they had a commander who had never commanded this before. That was part of the plan. Can you address the state law issue, which I find a little baffling and perhaps more promising from your point of view? Yes, Your Honor. The public duty doctrine in Washington State just simply is inapplicable, as the district court held on the motion to dismiss, in situations where specific individuals, not the general public, are owed a duty. In this case, they were able to, the police commanders were able to visualize the specific individuals and distinct class of individuals who were present in Pioneer Square. Isn't that, they had a duty, I mean, in a broad sense, they had a duty to protect public safety, which would have been of everybody who was there or elsewhere in the city of Seattle, right? Yes, in a general sense. So how does it narrow down to these people? Well, because in this circumstance, the... Anyway, in other words, how do you distinguish the general public duty of maintaining public order? Well, under state law... That's what happened here. Yeah, the general public duty is a duty to no one. But under state law, it not only be a specific individual plaintiff or person, but can be a distinct class of people that is protected from negligent actions in the city in this case. Not... Doesn't have to be just one individual. And therefore, the public duty doctrine, as the district court held, is inapplicable. The only factual difference that the district court talked about was the factual difference of announced policy. Well, the announced policy has nothing to do with whether there's a discrete class of individuals that are subject to the need for protection. In this case, there was a discrete... The answer may be that the public, as the California and Washington courts seem to be saying, that the public duty doctrine sort of doesn't exist. But on your theory, what would be an example of the application of the public duty clause? Well, for instance, if... It may not be one. Again, there hasn't been one in the State of Washington for a very long time. There hasn't been. And Justice Sutter made it very clear that the public duty doctrine doesn't abrogate the abrogation of governmental liability. There's never been, as far as I know, a case in which the public duty doctrine has held the bar. But in a circumstance, for instance, where there's a... I suppose there's a situation in which when a police officer is asked to report to a particular area and merely fails to report, a particular area without any particular problem, fails to report as a result of which some crime is committed, and they have no idea who the specific individuals or discrete class of people are. Discrete class of people. I mean, on your theory, the discrete class of people are people who are in that spot and subject to being attacked. I mean, that's really how you've defined it. Well, this was specifically observed by the police. It specifically could be seen and observed by the police to be in an area that was in danger of these roving gangs coming in. Yes, those are discrete individuals. I mean, it's up to the Washington Supreme Court, I suppose, and it could usefully be certified to them as to whether... But the Court has held the discrete class of individuals... Are you arguing any of the exceptions to the public duty clause? Well, we did in our briefing. The rescue doctrine was argued. But, you know, the original instinct that the district court had, which is it's inapplicable, is really the instinct. And then nothing changed in terms of any relevant or pertinent facts that would suggest that that original instinct shouldn't be followed through with and be basically the holding. It should be reversed because there's a discrete class of individuals. I see my time is up. I have four minutes left, or approximately four minutes. I appreciate the Court's questions. Thank you. Mr. Buck. Good morning. Ted Buck with Raul Martinez with Stafford Fry Cooper on behalf of Gil Kerlikowske, the Chief of Police, former Mayor Paul Schell in the City of Seattle. It is uncontroverted and hasn't been argued before this Court that the general rule of the Due Process Clause is that the government owes no duty to individuals to protect them from the violence of other private parties. The Due Process Clause protects people from violence from the government. All right. So what does that mean? Does that mean suppose the police was standing there and somebody walked up to the me unless you do something? Then what? It's okay for the policeman to turn around and say I'm going to dinner? As sympathetic as the facts that you've outlined are, yes, it's okay. It is not a violation of the Due Process Clause. Those very facts have been handled by this Court on several occasions, most notably the DeMaria case where police officers actually arrived at the time when the neighbor who was repeatedly harassing his neighbor was standing with a shotgun, threatening the neighbor and the police took no action to prevent that threat. It was not state-created danger. It was private party-created danger. We have to remember that we're a free society. Our freedom depends upon the government leaving us alone. It doesn't depend on us leaving each other alone. This case has a, basically what's being argued here, if I may be so bold as to suggest the plaintiff's claims here. What about under state law? What about my hypothetical under state law? Okay. Take your hypothetical under state law? No, it doesn't fall into any of the exceptions to the public duty doctrine. There's been no... It doesn't fall under the public duty doctrine. Some discreet individual is going up to the police and saying that person is about to kill me and the police who are charged by the State of Washington, if not by the United States Constitution, with preventing crime and protecting people can simply turn around and that would come within the public duty doctrine. Torres v. Anna Cordes is right on points, Your Honor. There the Court talks about what steps a police officer or a governmental agency needs to take in order to have itself in a special relationship with a person so that they can be liable despite the public duty doctrine. And under those circumstances, the Court said, just because a police officer or a governmental entity knows that there's a risk ongoing, unless they do something additionally which stops the person from taking action to protect themselves, for example, in that case saying we are going to pursue this case, we are going to put it in front of the prosecuting attorney, the Court said that's the only thing that gets you beyond the public duty doctrine there is because there was an affirmative statement of assistance that created a relationship. In the event that a person is merely a person who merely approaches a police officer and says I'm in danger and the police officer takes no action, it falls squarely within the provisions of the public duty doctrine. So what we're talking about here is whether under these facts, which are undeniably sympathetic facts, the danger creation theory should be breathtakingly expanded beyond that which is previously, the position it has previously been held to. The current rule is this. The exception exists. There is a due process violation if the State, as Judge Reimer noted, takes direct affirmative action which places a person in danger that they have not previously experienced. Now, plaintiffs are arguing for this really sweeping expansion of the danger creation theory despite acknowledging that the police had no contact whatsoever with the individuals in the crowd that night, let alone with these individual plaintiffs. They admit that there was no contact with the assailants until after the riots. Most of these people have been arrested based on video camera evidence and so forth. And based upon this absolute lack of State contact, they say because people were hurt, you should say that the police had an obligation to step in and do something. I quite agree, and I think frankly if you ask people in the Seattle Police Department, including the named defendant, Gil Kerlikowski, in retrospect, would you have gone back and made a different decision? I think he would say yes. But when a police officer, even if it's the chief of police, is faced with two bad choices, chooses one and harm results where it could very easily have been choosing the other one and greater harm would have resulted, that isn't deliberate indifference. It's the other requirement for the State-created danger exception. One thing that hasn't been discussed here and frankly was not discussed in any detail at the district court level in the plaintiff's argument either is the case law. If one reads the cases and looks at what the Supreme Court, which of course we're bound to follow here, and what this Court has said about the danger-created theory in the past, this case becomes fairly easy to decide, even upon all the facts as alleged by the plaintiffs. One needs to look no further than the Amos v. City of Page case. It's a Ninth Circuit opinion. In that case, a man crossed the center line, was involved in a serious head-on collision, and fled into the desert. Civilians happened by the scene and started to look for the man because it was obvious he had to be hurt. There was blood in his car. It was a terrible collision. The other driver of the car had to be cut out of the vehicle. Police arrived at the scene and, pursuant to their policy, told people to go home. So they stopped the private rescuers from doing their job or doing what they were trying to do. And then the police undertook only a cursory search of the area around the cars. They went to the car and they saw blood in the car. They knew the man was injured. They went into the desert. They found signs that he was stumbling on his hands and knees, walking in circles. And yet they abandoned the search, and he was, of course, found dead later. They didn't go back to search again until about a month later. Under those circumstances, the police were actually involved in the process. They were, and I don't understand the result in that case. But I don't think this case is stronger for you than that one is. Oh, I agree completely. In this case, there is no involvement of the police in anything associated with preventing the individuals from taking care of themselves, stopping other people from taking care of the plaintiffs, or any contact. So if in Amos v. the City of Page there is no due process violation for what the police did, how could there possibly be in our case? Surely there was a bad decision made. Surely it was an improper or not improper, but it was perhaps an imprudent policy to not search privately. But the state didn't create the danger. The question that the Amos case raises to me is that's an overstatement in the sense, but this may, this is a problem that underlines the Shining Land cases. The State has a police force. We rely on them having a police force. We rely on the fact that there are large groups of people that the police will try and take care of us. I understand your position that in this instance they were trying to, and let's assume that's correct. But suppose the facts were more extreme. Suppose they had simply all just left the scene, said we're going home to dinner, we're having a party. Even though we essentially as a civilized society have decided to have a police force, and we know as a matter of practice that they are there in large gatherings, and we didn't think they were going to be there. We wouldn't go. So it isn't so that they had, that the existence of the police force and the expectation that they would be there had nothing to do with the creation of the danger? No. Actually, Your Honor, I think this is completely analogous to the situation that the Supreme Court tackled recently in the Castle Rock case. Castle Rock v. Gonzalez. The police were clearly fully aware that there was a dangerous situation brewing. The mother of those children, disgusting case, actually, repeatedly went to the police and asked for help. Time after time after time, the police refused to do anything about it. In fact, at times they just hung up. One officer, when she went in at midnight to say, my kids still aren't home, went to dinner. Now, of course, Castle Rock was on a, had a very peculiar theory. It was a procedural DuPont process theory, and they were trying to find out whether there was a property right. So it isn't directly on point, although certainly one assumes that they wouldn't have found a substantive problem either. But that wasn't exactly what they were deciding. It's perhaps more telling because the due process claim had been disposed of at the district court level and had been disposed of on appeal by the, by the Circuit Court of Appeals, and was not even, they didn't even bother to bring it up at the Supreme Court level. But interestingly, what Judge Scalia said in the majority opinion in town of Castle Rock is it doesn't matter whether we're pursuing a procedural due process claim or a substantive due process claim, there isn't an obligation here. There is no right that the, that the state has violated as opposed to the improper act of a private party. So even under that extreme scenario, Your Honor, there is no liability for the city when the city simply does not take steps to protect people from private violence. Now, the Descheny case is another very troubling case. That if you weigh the facts of this case to the Descheny case, one must wonder how, how could we possibly be liable for this. In Descheny, there was a lot of involvement with the governmental entity and the victim of the crime. Well, the difference is that you were, that the, here the police were standing there seeing the violence. That is a difference. It didn't happen without their direct knowledge. So that, that seems to me to be, to have a difference. I mean, the police can't expect to be everywhere and they can't, and, and nor can Child Protective Services. But when they're actually physically present is the question. Watching things. I guess my question is, you know, which cases are there that deal with that, when the police are actually there watching the violence? Well, the DeMaria case goes right to the, to the heart of that, Your Honor. In fact, the DeMaria case does take on the issue of this emboldening idea, too. If, if simply failing to act emboldens criminals, then that claim can be made every time there's a private act of violence against another person, because a clever plaintiff's attorney could always come and say, if your patrols had been better. I'm sorry? If your patrols had been better, the person would have known that they could get away with the crime. No, but that's why I'm trying to distinguish the situation in which they're physically present watching the violence. It isn't just a question of not being someplace. They were there. Consider, if you would, then, Your Honor, the Balistreri case, in which case the Which case, I'm sorry? Balistreri and another Ninth Circuit opinion. It's cited, I know, in our, in our brief, but not in both briefs. 901 Fed Second 696. In that case, police responded to a call of domestic violence. When they arrived, there was ample evidence of domestic violence. The plaintiff in that case, Ms. Balistreri, was beaten. She required medical attention. Police removed her husband from the house, did not arrest him, did not make him leave, or anything else. Over the course of the next several years, Ms. Balistreri repeatedly called the and told of threatening telephone calls she was receiving, intimidation, harassment, vandalism to her home. Her husband crashed his car through her garage door at one point. She received a threatening call one night, shortly followed by a firebomb through her window. In all of those circumstances, the police took no action. And the court said there is no constitutional due process violation there because the police didn't create that risk. The husband created the risk. That the police merely failed to stop him from acting is not sufficient because the general rule is the Constitution doesn't afford you the protection of the government from private violence. In fact, the Balistreri case, in discussing the affirmative duty, says that that affirmative duty to protect arises not from the individual's predicament or that the officers know of it, or even from officers' expressions of an intent to help, but rather from changing the plaintiff or the victim's position so that they cannot take care of themselves. Now, there's been no allegation in this case that these plaintiffs could not have simply left the downtown area, the Pioneer Square area. Surely, if their claim is that the police commander standing on the top of the sunken ship garage, who could only furtively look out in the crowd because when they could see that there was danger brewing in the crowd, the people in the crowd could see it as well. The police never took their ability to simply leave away from them. What's that how I understand the facts? My understanding is that the police saw outside the area that these gang people were arriving, and they knew that. The people inside the area may well not have known that. There's no reason they would have. So to that degree, the police had knowledge of a danger that they didn't give people. Is that accurate? Well, no. Actually, Your Honor, the whole premise of this idea that the police knew that there were roving bands of 15 to 20 gang members in the crowd assaulting people comes from one radio dispatcher, one 911 call. At about 10.30 in the evening, a civilian called up and said, a couple of carloads of guys that look like gang members just pulled up outside of Pioneer Square, and they're practicing fighting moves, and they're going into the Pioneer Square area. But I think they may be heading in to commit crimes or to what it says is cause fight disturbances. Let's suppose that the police actually saw it. I mean, just for hypothetical purposes. Okay. Then what? Do you still have the same result? The police saw it, knew they were coming. If the police actually saw it, it would be a valid statement. The people inside didn't know it. I'm sorry, Your Honor? The people inside did not know it. And the police, let's also assume, could have stopped. And the fact that the police just let them go in when the people inside were not in a position to protect themselves from these people because they didn't know they were coming, but the police did. Your question really breaks down then on two lines. One is, what if the police did see them and didn't stop them? Is there a due process violation? And the question is no, because the cases we've already discussed, Balestrari, DeMaria, where the police actually saw the violence going on and did nothing, the courts have ruled that that isn't a due process violation. Now, the second question is, what if the people didn't know about the risk? They didn't know the gang members were coming. That's been handled by dozens of cases in which people have claimed that state agencies, state actors, police departments, corrections officers have negligently or have intentionally released dangerous people into the population without warning the population about it. And those people end up committing crimes against them. One of the cases that is relevant to that is cited in our brief. It's the Butera case. I'm sorry, it's not Butera. Bowers v. DeVito. In that case, a man had murdered a person with a knife. He was found to be not guilty because of criminal insanity. He was in a state institution for five years. Eventually, they released him. He was not cured. They knew he wasn't cured. They knew he was still at risk. He subsequently went out and murdered another person. And the cause of action was, how could you do this without warning the populace? They didn't know that this risk was out there. And the court said, if the state had never been involved in that, if the state had never held him, the risk wouldn't have been any greater. And that's what one of the keys to this court's decision in this case has to be. Look at Amos v. City of Page. Look at DeShaney and the courts in both. It's the Ninth Circuit and the U.S. Supreme Court say the same thing. And they say the test is, if the police created it, here's the test. If they hadn't shown up at all, would the people have been in better shape than because they did show up? Hence, in DeShaney, the court said, the state's involvement only prolonged the harm that was going to happen to little Joshua. Well, they might have been, because they might have been a lot more likely to just get out of there. I mean, in other words, one assumes that if the police are there, the police are going to do it. I'm sorry, Your Honor. I can't hear you. They might have been. If you put it that way, they may be. People in the Pioneer Square may well have been better off if the police were not there at all, because then they would have left. They wouldn't have expected to be protected, and they just wouldn't. They would have understood the risk, and they would have left. The problem is that there's historical expectations that the police are going to take care of people. And I mean, in this case, I think you have, you know, another line of defense, which is they were trying to, by their best lights. They may have been wrong, but they were trying to. But I'm trying to understand the scope of the theory, and I'm trying to understand what if they had simply, you know, turned their backs and, you know, gotten drunk. And the answer to the question then of whether the people would have been worse off, or worse off for the police being there, is yes. Your Honor, actually, no. According to binding precedent, the answer to that question is no. If the police simply do not act when they're aware of it, and even when the participants But in the real world, the answer is yes, because in the real world, whether people go into large crowds has something to do with whether they think that the police are in control of the situation. If there were facts to that extent, Your Honor, it would have been nice to see them. We're here on summary judgment. It was the obligation of the plaintiffs to present some factual material that suggested that they actually did go in, relying on police protection, but there was not. I understand. But in the real world, if I am trying to decide whether to go into a large crowd, the question of whether the police are going to be there and be competent has something to do with that decision. Your Honor, I think in the real world, most people don't think about it. In the real world, most people go out on events like Mardi Gras and on St. Patrick's Day thinking, I'm going to go downtown. Because they expect the police to be there, but you're going to control things. If there were a history of the police not doing so, they'd stop going. Your Honor, I think that's speculative. I think if the Constitution doesn't require a city to have a police department, there are large-scale gatherings all over the country, sturges, a number of music events where people show up knowing darn good and well there's not going to be any police protection there. They're in just as much danger there as they would be in a Mardi Gras situation in downtown Seattle or in any other large-scale event. The fact of the matter is, Your Honor, I think that you're not actually right. There's no fact that suggests that these people went in relying on police protection. And, in fact, I think they went in to go to bars and have fun on Mardi Gras. That's what people think about when they're going downtown. Now, I'm running very low on time, but I do want to point out that the whole thrust of the plaintiff's case is this change of policy thing that the City of Seattle failed to abide by standard policies or accepted procedures. And yet, in his deposition, which is cited in our brief, Mr. Ryder, the only basis for that claim, says that there are no precise guidelines for when to disperse a crowd. That deviating from a plan happens all the time. In fact, he said, I have never seen a crowd control plan follow to a tee. There are always things that come up that you can't expect. But the commander should consider changes to a plan, and they may have to scrap the plan altogether. This is all from the plaintiff's expert. If you might want to wrap up. Yes. Well, Your Honor, I will wrap up by, I understand the court's concerned, because this is a sympathetic case. But as the Supreme Court said in the Descheny case, we're moved by natural sympathy in a case like this to find a way for Joshua and his mother to receive adequate compensation. But the most that can be said of the State functionaries in this case is they stood by and did nothing when suspicious circumstances dictated more active behavior. That's the most they can say. I appreciate it. Thank you, Mr. Faulk. Mr. Whitty. I think I have about four minutes and 13 seconds. I'd like to address the law that counsel cited. Counsel stated that the test is whether police created a danger that did not previously exist. And that specific legal standard has been rejected. It's been rejected by this court in Kennedy. It's been rejected by this court in the cases that Kennedy cites. Even the dissent from the in-bank reconsideration in Kennedy said that the police participated in the creation of a danger. That's sufficient under the law. So counsel cited a rejected standard, which is that the police must create the danger in the first place. And that's not the law. In fact, the Kennedy decision made it very clear that the debate over danger creation versus danger enhancement is over. And cited, in fact, the various decisions of this court that is rejected. That Piniella, in particular, said that's an indeterminate line. The issue is whether there was a state action, affirmative action versus a mere inaction or passive inaction. The Amos case is clearly distinguished. In that case, the court held that there was no reason to believe that any of the, quote-unquote, civilian rescue efforts would have been successful had the police not intervened. They cite the Castle Rock case. I think that's a procedural due process property rights case that's inimplicable. Ballast theory is the same facts as Descheny. And by the way, the state-created dangers theory, as the Kennedy court held, predated Descheny. There was cases in the circuit courts that created this doctrine well before Descheny. The whole notion that the plaintiff ---- I have two questions. One is, what is the danger enhancement here, if that's what you're saying, Mr. Chapman? Well, the enhancement is that the danger was, of course, from the gangs, okay, that they knew about. And by the way, counsel is incorrect. There are three instances in the record in which the gangs were observed. Two or three carloads of gangs were observed practicing kicking and fighting, observed going toward Pioneer Square, number one. Police on the perimeter observed known gang members entering the crowd, number two. Radio communications and 911 autotapes document the information being relayed to the police regarding the increased presence of gangs in the area. This was not a mystery. And it's absolutely true that the plaintiffs in this case had no idea that all of a sudden gangs were entering, that the police didn't do anything to stop or had a plan to let them enter until they got the receiving ends of brass knuckles. That's when the plaintiffs first learned about the gangs and were being yelled at in racial epithets. So the facts are clear. So that's the danger. Now, what is enhancing the danger? Enhancing the danger is, if you read the plan itself, the operational plan was to intercede and interject aggressively with high visibility to intercede to make sure that those criminal actions don't occur. That was the plan. And that plan then was discarded. And 11th hour attempts were made. There was a reason why it was discarded. Isn't that true? The reason it was discarded, Your Honor, quite right, is because the shop owners and the businesses in the area Friday, Saturday night complained of over-aggressive police when they dispersed the crowd. Wasn't there also a reason that they were afraid that it would incite greater violence if the police came back based on what they had experienced the previous two nights? No, the facts are that the plan was abandoned well before the beginning of the evening. The facts are, isn't that all of a sudden at 11 o'clock, Commander Bryant decided to withdraw troops? That's not the facts. That's the spin that the cities tried to put on it. The facts are that it was before the event. And this is, by the way, in Chief Diaz's after-action report, that what had been a pre-planned event with a written operational plan with Sergeant or Lieutenant Pugel, the most experienced commander who had been in the WTO, he was told not to come. So that was well before the event. Obviously the commander was well before the event. Sorry, Your Honor. But the danger enhancement is as compared to what would have been the case if the police weren't involved, not as compared to what would have been the case if the police were involved in a different way. Yes. The danger enhancement is that the police, because of the policy that they had abandoned, didn't do what Sergeant Scott testified to he could in his deposition. What would have been done? They would have identified who those gang members were before they got in there. They would have signed a situational action team, assessment team. They would have had an arrest team, and they would have observed them. They would have questioned. They would have found that Jarrell Thomas had brass knuckles on him. One last question on the state law issue. You're a little over your time, but I'd like an answer to it. Thank you. The Torres case was after the case saying there's nothing left to the public duty doctrine. So it appears there is something left to the public duty doctrine. So what do we do with that? Well, first of all, the Osborne v. Mason case holds that you need a distinct class of individuals that's subject to a negligence claim and doesn't fall within the public duty doctrine. The public duty doctrine, you know, in the decision the Court's raising, is basically the exceptions. By the way, there's more than four exceptions, but the exceptions engulf the rule. But the rule doesn't even apply in the instance in which there's a specific discrete class of plaintiffs that are identified. Is there any reason to consider certifying this case to the Washington Supreme Court on that issue? That would be the reason, because the Washington Supreme Court would be best situated, Your Honor, to determine in the facts of this particular case whether the public duty doctrine does or does not apply. And we've suggested that in our brief. Thank you very much. Thank you, Counsel. The matter just argued will be submitted.
judges: Alarcon, Rymer, Berzon